IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

COALITION OF CONCERNED CITIZENS
TO MAKEARTSMART, an Unincorporated
Association, *et al.*,

      Plaintiffs,

vs.

FEDERAL TRANSIT ADMINISTRATION OF
U.S. DEPARTMENT OF TRANSPORTATION,
an Agency of the United States, *et al.,*

      Defendants.                         Civ. No. 16-252 KG/KBM
                                                                           Consolidated With
and                                                                                 Civ. No. 16-354 KG/KBM

MARIA BAUTISTA, *et al.,*

      Plaintiffs,

vs.

FEDERAL TRANSIT ADMINISTRATION OF
U.S. DEPARTMENT OF TRANSPORTATION,
an Agency of the United States, *et al.*,

      Defendants.

MEMORANDUM OPINION AND ORDER

This matter comes before me upon Plaintiffs Coalition to Make ART Smart, et al.'s Motion for a Preliminary Injunction and Bautista Plaintiffs' Motion for Preliminary Injunction (collectively, Motions for Preliminary Injunction). (Docs. 45 and 48). Both Motions are completely briefed. (Docs. 49, 50, 68, 70, 72, 79, 80, 82, 83). I held a three-day hearing on the Motions for Preliminary Injunction on July 27-29, 2016.

In applying for a Federal Transit Authority (FTA) Small Starts grant to fund, in part, the Albuquerque Rapid Transit (ART) project, the City applied for a documented categorical exclusion (CE).  A CE would exclude the City of Albuquerque (City) from engaging in the environmental assessment or environmental impact statement processes under the National Environmental Policy Act (NEPA).  The Coalition of Concerned Citizens to Make ART Smart Plaintiffs (Coalition Plaintiffs) contest the FTA's approval of the City's application for a CE as a violation of NEPA.

Also, in reviewing a Small Starts application, the FTA is required under Section 106 of the National Historic Preservation Act (NHPA) to identify historic properties that are eligible for the National Register listing, assess the project's effects on those properties, and avoid or mitigate any adverse effects.  36 C.F.R. §§ 800.2 and 800.4-800.6.  In this case, the FTA, in consultation with the State Historic Preservation Officer (SHPO), concluded that there would be no adverse effects to the area of potential effect (APE) related to the ART project.  The Coalition and Bautista Plaintiffs (collectively, Plaintiffs) contest the FTA's finding of no adverse effect as a violation of the NHPA.[1]

Plaintiffs now seek a preliminary injunction to halt the start of the ART project while the Court considers the merits of their lawsuit.  Prior to the evidentiary hearing, I reviewed the Preliminary Administrative Record (ABQ PAR) and briefs.  Furthermore, I have considered testimony of witnesses and the argument of counsel.

If or when the ART project is constructed and put into operation, there may be a day when I will utilize it and fully realize everything the system now is envisioned to be: a speedy, convenient, environmentally smart transportation system that, in addition, spurs necessary

---

[1] Plaintiffs have brought other claims against Defendants, but Plaintiffs focused on the NEPA and NHPA claims during the hearing on the Motions for Preliminary Injunction.

economic development into an area of Albuquerque that needs it. Today, however, and from a personal standpoint, I cannot be certain that I buy in. It means changes to an area of Albuquerque that I may not be ready to accept. But to resolve this matter, I must set aside my personal opinion and employ the correct legal standards. Indeed, this Court is bound by those standards. And after objectively applying the correct legal standards and considering all the aforementioned submissions, I must DENY the motions.

A. *Standards*

    1. *Preliminary Injunction*

To obtain a preliminary injunction under Fed. R. Civ. P. 65, the moving party bears the burden of showing: (1) a substantial likelihood of success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Fed. Lands Legal Consortium ex rel. Robart Estate v. United States*, 195 F.3d 1190, 1194 (10th Cir. 1999) (citing *Chemical Weapons Working Group, Inc. v. United States Dep't of the Army,* 111 F.3d 1485, 1489 (10th Cir.1997)). "As a preliminary injunction is an extraordinary remedy, the [requesting party's] right to relief must be clear and unequivocal." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001) (citing *SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1098 (10th Cir.1991)).

    2. *The Administrative Procedures Act (APA)*

Both the NEPA and NHPA claims are brought under the APA. Under the APA, any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5

U.S.C. § 702. The reviewing court shall set aside the agency action under 5 U.S.C. § 706(2)(A) if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law…."

Under § 706(2)(A) of the APA, an agency's action is "arbitrary and capricious 'if the agency ... entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Utah Envtl. Cong. v. Bosworth,* 443 F.3d 732, 739 (10th Cir. 2006) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). Likewise, an agency's decision is arbitrary and capricious if the agency failed to base its decision on "consideration of the relevant factors," or if "there has been a clear error of judgment" on the agency's part. *Id.*

"When courts consider such challenges, an agency's decision is entitled to a presumption of regularity, and the challenger bears the burden of persuasion." *San Juan Citizens Alliance v. Stiles,* 654 F.3d 1038, 1045 (10th Cir.2011) (citations omitted). The Court's deferential review "is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise." *Utah Envtl. Cong. v. Russell,* 518 F.3d 817, 824 (10th Cir.2008) (citing *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 378 (1989)); *see also San Juan Citizens Alliance v. Stiles,* 654 F.3d 1038, 1045 (10th Cir. 2011) ("[W]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinion of its own qualified experts, even if, as an original matter, a court might find contrary views more persuasive." (quotations omitted)). The Court recognizes that the arbitrary and capricious standard along with the deference to the agency impose a high barrier for Plaintiffs to clear in order to show a likelihood of success on the merits of the NEPA and NHPA claims. Indeed, for Plaintiffs, this is an unavoidable tall order.

B. *Requirements for a Preliminary Injunction*

    1. *Likelihood of Success on the Merits*

        a. *NEPA Claim*

Class II actions are actions which "do not individually or cumulatively have a significant environmental effect" and are excluded from EIS or EA requirements, i.e., they are categorically excluded in a CE. 23 C.F.R.§ 771.115(b). A CE designation is appropriate if an action does not involve "significant environmental impacts." 23 C.F.R. § 771.118(a). More specifically, a CE designation is appropriate if an action does not have a significant impact on natural, cultural, and historical resources or does not significantly impact travel patterns. *Id.* An action which the FTA would normally consider a CE "but could involve unusual circumstances will require the FTA, in cooperation with the applicant, to conduct environmental studies to determine if the CE classification is proper." *Id.* at § 771.118(b). Such an unusual circumstance includes when there is "[s]ubstantial controversy on environmental grounds." *Id.* at § 771.118(b)(2).

When examining an agency's CE determination under NEPA, the Court must heed the Tenth Circuit's explanation of an agency's obligations under NEPA:

> NEPA places upon federal agencies the obligation "to consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). It also ensures that an agency will inform the public that it has considered environmental concerns in its decision-making process. *Id.* The Act does not require agencies to elevate environmental concerns over other appropriate considerations, however; it requires only that the agency take a "hard look" at the environmental consequences before taking a major action. *Id.* In other words, it "'prohibits uninformed-rather than unwise-agency action.'" *Custer County Action Ass'n. v. Garvey,* 256 F.3d 1024, 1034 (10th Cir.2001). The role of the courts in reviewing compliance with NEPA "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Baltimore Gas & Elec.,* 462 U.S. at 97-98, 103 S.Ct. 2246.

*Utah Shared Access All. v. U.S. Forest Serv.*, 288 F.3d 1205, 1207-08 (10th Cir. 2002).

Plaintiffs argue first that the FTA did not take a "hard look" at the City's CE application and that the FTA's decision to approve the CE application was arbitrary and capricious. A brief approval of a CE application, like in this case, does not necessarily constitute a failure to take a "hard look." Defendants cite *Wilderness Watch & Pub. Employees for Envtl. Responsibility v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004) ("Documentation of reliance on a categorical exclusion need not be detailed or lengthy. It need only be long enough to indicate to a reviewing court that the agency indeed considered whether or not a categorical exclusion applied and concluded that it did."). In fact, upon questioning of Defendant Donald Koski, Director of Planning and Program Development of Region VI of the FTA, Koski indicated that his staff reviewed a draft of the CE application, communicated with the City regarding its project development request, consulted with the SHPO, and reviewed the final CE application as did Koski. FTA Exs. 1-5. These actions demonstrate that the FTA took the required "hard look" at the CE application.

Plaintiffs also argue that the FTA's action was arbitrary and capricious because the City's CE application did not consider economic impacts on businesses or traffic issues such as congestion and diversion of traffic to neighborhoods adjacent to Central Avenue. The City, however, did provide the FTA with a business access technical supplement and a traffic assessment technical supplement in response to the CE worksheet's request for information related to "economic environment" and traffic patterns. (Doc. 54-1) at 6-7. Those supplements indicate that no business will lose access, congestion will be minimalized with signalized left and u-turns, and that diversion into neighborhoods would amount to 250 vehicles daily. The diversion number is supported by a traffic engineer's expert opinion. I note that although traffic congestion will increase at intersections in 2035, the CE application only required a traffic

congestion projection to 2017. Even with an increase in traffic in 2035, the City provided mitigation actions to alleviate that congestion. I conclude that the FTA considered relevant factors, like economic environment and traffic patterns. The FTA's actions would only be arbitrary and capricious if it "entirely failed" to consider those factors. I cannot find that the FTA entirely failed here. Moreover, the Court presumes that the FTA's action was regular, a presumption Plaintiffs did not rebut. Finally, the Court gives strong deference to the FTA's technical expertise in this matter.

Next, Plaintiffs argue that because there was a "substantial controversy on environmental grounds," the FTA should not have approved the CE application. It is quite clear to me there is opposition to this project. Opposition, however, does not necessarily mean a substantial controversy. As one court explained,

> "[The mere existence of opposition does not trigger the [agency's] duty to prepare an environmental review." *West Houston Air Committee v. FAA,* 784 F.2d 702, 705 (5th Cir.1986). Courts "long ago rejected the suggestion that 'controversial' must necessarily be equated with opposition." *North Carolina v. FAA,* 957 F.2d 1125, 1133–34 (4th Cir.1992). Otherwise, "opposition, and not the reasoned analysis set forth in the environmental assessment, would determine whether a[ ][CE] would have to be prepared." *Id.* Thus, "the outcome would be governed by a 'heckler's veto.'" *North Carolina,* 957 F.2d at 1134 (quoting *River Road Alliance, Inc. v. Corps of Eng'rs of United States Army,* 764 F.2d 445, 451 (7th Cir.1985)); *see also Friends of Richards–Gebaur Airport v. FAA,* 251 F.3d 1178, 1187 (8th Cir.2001) (upholding CE based in part on "determination that 65 letters opposing the project [most of which did not voice environmental concerns] did not constitute a substantial controversy on environmental grounds").

*Aquifer Guardians in Urban Areas v. Fed. Highway Admin.*, 779 F. Supp. 2d 542, 572 (W.D. Tex. 2011).

The CE application includes a detailed summary of comments, including negative comments, but those comments do not suggest "substantial controversy on environmental grounds." General concerns and even economic impacts are not "environmental grounds" for purposes of assessing public controversy. *See Hells Canyon Pres. Council v. Jacoby*, 9 F. Supp.

2d 1216, 1242 (D. Or. 1998) ("general remarks regarding concerns" not enough to establish substantial controversy).  Moreover, the negative comments did not identify a substantial controversy over the size, nature or effect of the environmental impacts.  *See Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156, 1181 (10th Cir. 2012) ("Controversy in this context does not mean opposition to a project, but rather a 'substantial dispute as to the size, nature, or effect of the action.'") (citation omitted).  Instead, many people complained about cost, access to businesses, lost parking, removal of the median, and preferred alignments.  These complaints do not meet the legal test.

       b. *NHPA Claim*

Plaintiffs complain that the FTA defined the APE too narrowly and argue that the ART project will "directly or indirectly cause alterations in the character or use of historic properties" beyond just the bus stations.  *See* 36 C.F.R. § 800.16(d).  In addition, Plaintiffs argue that the FTA ignored the fact that the ART project will introduce "visual, atmospheric or audible elements" that will diminish the historical nature of properties.  *See* 36 C.F.R. § 800.5(a)(2)(v).  Plaintiffs contend that the City must consider the cumulative impact of ART in determining whether ART will adversely affect historic resources.  36 C.F.R. § 800.5(a)(1) ("Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative.").

The FTA, in consultation with the SHPO, defined the APE and considered potential effects of ART, and so concluded that they would not have an adverse effect on any historic resource.  Moreover, the eclectic nature of Central Avenue does not lend itself to being designated a historic district.  As Jeff Fredine testified, historic districts are comprised of a similarly aged and designed cluster of properties.  This testimony is in line with David

Kammer's 2003 study, relied on by the City in its CE application: "Route 66, as an individual property type, through the current project area does not retain enough integrity to convey its historic significance and is recommended not eligible to the National Register of Historic Places (NRHP)." ABQ PAR 03011-12.  Although, Kammer states that the Historic Preservation Department and others "should collectively address the possibility of nominating Route 66-related historic districts in urban areas" including in Albuquerque, that possibility has not been addressed and planners such as Fredine continue to concur with Kammer's conclusion that Route 66 in Albuquerque, though historic and much loved by Albuquerqueans and tourists alike, would not be eligible for inclusion on the NRHP.  Route 66 Resurvey Pt. 2, pg. 19-20.  Indirect effects, like a change in the feeling or setting of Central Avenue after the ART project is built, would also not necessarily affect the historic integrity of Central Avenue when one considers the lack of cohesive design in properties.

Plaintiffs also note that the FTA did not provide the SHPO with the City's traffic study. *See Pueblo of Sandia v. United States*, 50 F.3d 856, 862 (10th Cir. 1995) ("Affording the SHPO an opportunity to offer input on potential historic properties would be meaningless unless the SHPO has access to available, relevant information.").  The SHPO knew what the ART design would be, including median stations.  Plaintiffs, however, have not sufficiently established how a study showing a diversion of 250 cars per day and possible increased congestion at intersections in 2035 would affect the SHPO's decision, which was based on a narrow APE and was concerned with visual issues.

In addition, Plaintiffs contend that the FTA failed to engage the public or seek public comment as required by the NHPA.  The regulations do not specify the form of public outreach required under NHPA, but do state that the need for public outreach can be adjusted to account

9

for "the nature and complexity of the undertaking and its effects on historic properties." 36 C.F.R. § 800.2(d)(1). The City, nonetheless, conducted public outreach which provided an opportunity to allow comment under the NHPA. *See* 36 C.F.R. § 800.2(d)(3). ("The agency official may use the agency's procedures for public involvement under the National Environmental Policy Act or other program requirements in lieu of public involvement requirements …. , if they provide adequate opportunities for public involvement consistent with this subpart.").

Michael Riordan, City Chief Operations Officer, testified the outreach included numerous one-on-one contacts with the public, door hangers, neighborhood meetings, other public meetings, and various other modes of outreach. From the testimony elicited at the hearing, it is clear that some people did not get the word. Many of those that did, nevertheless, do not believe that they were heard. And those that commented, believed they were ignored. But what also is clear from the testimony and the record is that the City's submission to the FTA included sizeable numbers of comments. The FTA could conclude from the CE application that the City engaged in public outreach which would have included comment required by the NHPA.

The Court cannot say that the FTA's decision to rely on the SHPO's concurrence as to the scope of the APE and ultimate no-adverse effect conclusion was a clear error of judgment or that the FTA "entirely failed" to consider relevant information. Consequently, the FTA's NHPA determination was not arbitrary and capricious.

*2. Irreparable Harm*

The Tenth Circuit has held "that harm to the environment may be presumed when an agency fails to comply with the required NEPA procedure." *Davis v. Mineta*, 302 F.3d 1104, 1115 (10th Cir. 2002). However, plaintiffs "must still make a specific showing that the

environmental harm results in irreparable injury to their specific environmental interests." *Id.* A plaintiff must show he will "suffer an injury that is not 'merely serious or substantial' but 'certain, great, actual and not theoretical.'" *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014).

Plaintiffs, in this case, have presented evidence that businesses and neighborhoods will be harmed by traffic congestion, safety issues, aesthetic and cultural loss, and loss of business. Indeed, testimony from witnesses Steve Paternoster, Anthony Anella, and Buck Buckner, for example, suggests a loss of business as a result of ART. However, Plaintiffs have not demonstrated that the asserted harms are irreparable. The City states in its briefing that the ART lanes could be redesignated as general use lanes without much trouble. Moreover, economic injuries are not irreparable, because they are typically compensable with monetary damages. *See Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) ("It is also well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages.").

Furthermore, the evidence shows any harm will also not be "certain or great." No business will close and at least one lane of Central will be open during construction. Once ART is built, left-hand turns will be restricted but it is not expected they will not prevent customer access. Moreover, the evidence indicates that over all access will improve with ART. The witness testimony about business decline, while sincere, does not meet the legal test: Plaintiffs have not provided any specific numbers or hard projections, for example, to show how much business will be lost. Also, any loss of foot traffic during construction would be temporary and foot traffic is expected to actually increase after ART is built due to improved streetscape. In

addition, the City will implement several mitigation actions during construction to minimize impact such as construction notices, low-or no-interest loans, and business consultants.

In addition, conclusory assertions of aesthetic harm are not sufficient to establish irreparable harm. *See Vill. of Logan*, 577 F. App'x at 767 ("Logan makes no attempt to appraise this court of any evidence showing what aesthetic damage will occur, where it will occur, how it will occur, or when it will occur—it merely posits that such harm will result. Such ipse dixit, however, is an insufficient basis to enjoin a project….").

Finally, I note that, as Judge Browning stated, "the invocation of an environmental statute such as NEPA does not alter these traditional rules for injunctive relief, and there is no presumption that an injunction automatically follows if there is any violation of an environmental statute." *Cty. of Los Alamos v. U.S. Dep't of Energy*, 2006 WL 1308305, at *8 (D.N.M. Jan. 13, 2006) (citing *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 313 (1982)). Plaintiffs must demonstrate a significant risk of "environmental harm [that would] result[] in irreparable injury to their specific environmental interests." *Davis*, 302 F.3d at 1115. The operative word here is "significant." Moreover, economic injuries are not environmental injuries. *See Moyle Petroleum v. LaHood*, 969 F. Supp. 2d 1332, 1336 (D. Utah 2013). A presumption of environmental harm also "only applies in cases where NEPA violations are likely to have occurred…." *Vill. of Logan*, 577 F. App'x at 767. As discussed *supra*, Plaintiffs have not shown that NEPA violations likely occurred. In sum, Plaintiffs have not satisfied the irreparable harm requirement for a preliminary injunction.

### 3. Whether Threatened Injury to Plaintiffs Outweighs the Harm the Preliminary Injunction May Cause Defendants

Plaintiffs argue that the threatened injuries, i.e., traffic congestion, safety issues, and loss of business, outweigh the inconvenience of complying with NEPA procedures, including an EA or possible EIS.  Plaintiffs cite the Ninth Circuit:  "The balance of equities and the public interest favor issuance of an injunction because allowing a potentially environmentally damaging program to proceed without an adequate record of decision runs contrary to the mandate of NEPA."  *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007).  Plaintiffs' harms, understandably, reflect personal preferences, but also do not meet the legal test.  *See Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987) (where injury to environment "not at all probable" and large expenditure of money on project, economic investment outweighs environmental harm).  Furthermore, not allowing ART to go forward will keep the City from building a project to revitalize the area and address pedestrian safety and improve transit efficiency.  Also, the evidence sufficiently indicates that delaying ART will lead to increased construction costs because the City will have to pay its contractors "to keep them mobilized during cold weather and for any period of delay caused by an injunction."  (Doc. 72) at 50.  Riordan testified that costs could amount to $7,500 per day should work stop.  Moreover, the City's current construction schedule is such that it will minimize impacts to businesses and residents, especially during peak shopping times during Christmas, Summerfest, Balloon Fiesta, and State Fair.  Plaintiffs have not persuaded me that this third preliminary injunction requirement favors a preliminary injunction.

### 4. Whether an Injunction Would be Adverse to the Public Interest

Because building ART will have "devastating consequences on Central's economy, area travel patterns, and historical resources," Plaintiffs argue that the public interest favors an

injunction. (Doc. 50) at 53. The City argues that the public interest requires denying an injunction. I agree. Completing the ART project on time will address existing safety concerns sooner and save the public money due to construction delays. Also, I note that an injunction will, in part, serve Plaintiffs' private interests, i.e., their business and financial interests, rather than the public's interest at large. Finally, I acknowledge that at least a majority of the City Council, the Mayor, and other elected officials have investigated the ART project and have determined that it is in the public's interest. A preliminary injunction, on the whole, would be adverse to the public interest.

    IT IS ORDERED that Plaintiffs Coalition to Make ART Smart, et al's Motion for a Preliminary Injunction and Bautista Plaintiffs' Motion for Preliminary Injunction (Docs. 45 and 48) are denied.

 

_____
UNITED STATES DISTRICT JUDGE